UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                Case No.  24-20196

v.

                                      Hon. Laurie J. Michelson

AXZAVIER HUDGINS,

        Defendant.
_____/

## MOTION TO DISMISS THE INDICTMENT
## PURSUANT TO THE SECOND AMENDMENT

Axzavier Hudgins moves to dismiss the Indictment because, as discussed in the attached brief, under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022), the criminal prohibition at 18 U.S.C. § 922(o) is unconstitutional facially and as applied to Hudgins. The government does not concur in the requested relief.

                                            Respectfully submitted,

                                            s/Benton C. Martin
                                            FEDERAL COMMUNITY DEFENDER
                                            Attorney for Axzavier Hudgins
                                            613 Abbott Street, Suite 500
                                            Detroit, Michigan 48226
                                            Phone:  (313) 967-5832
                                            E-mail:  Benton_Martin@fd.org

Date: July 9, 2024

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,        Case No.  24-20196

v.

                              Hon. Laurie J. Michelson

AXZAVIER HUDGINS,

        Defendant.

_____/

## BRIEF IN SUPPORT OF MOTION TO DISMISS

### BACKGROUND

Axzavier Hudgins is charged by Indictment with a single count of illegal possession of a machinegun under 18 U.S.C. § 922(o) because he allegedly possessed a Glock, model 19, 9mm pistol, equipped with a machine gun conversion device. (R. 16, Indictment, PgID 31.)

### ARGUMENT

The Second Amendment provides that "[a] well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In *Bruen,* 597 U.S. at 22, the Supreme Court replaced an interest-balancing approach to the Second Amendment with an analysis grounded only in constitutional "text and

1

history." Specifically, *Bruen* instructs that, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and the government may rebut the presumption of unconstitutionality only by showing that "the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 24.

Under *Bruen's* "text and history" standard, criminalizing machinegun possession under 18 U.S.C. § 922(o) is unconstitutional. Section 922(o) violates the Second Amendment both facially and as applied after *Bruen* because, under the government's interpretation, it criminalizes possession of firearms "in common use"—in particular Glock switches—for the purpose of self-defense. 597 U.S. at 47. As *Bruen* explains, "even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." 597 U.S. at 28. Section 922(o) is inconsistent with our country's historical tradition of firearms restrictions, and the government will be unable to point to "relevantly similar" restrictions to § 922(o) from the time the Second Amendment was promulgated.

2

I. *Bruen* renders § 922(o) presumptively unconstitutional and puts the burden on the government to rebut that presumption.

To defend a presumptively unconstitutional regulation, *Bruen* held "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." 597 U.S. at 17. This test asks whether there exists a historical precedent that "evinces a comparable tradition of regulation." *Id.* at 27. When no historical tradition exists, the challenged statute is unconstitutional. *Id.* at 28. If the historical record is ambiguous, courts must "favor [the interpretation] that is more consistent with the Second Amendment's command." *Id.* at 44 n. 11.

The most relevant historical precedents are those that existed during the founding generation, when the Second Amendment was ratified. *Id.* at 34–35. Pre-ratification history can be relevant, but courts must consider how remote the regulation was to ratification and if intervening legal or linguistic changes render the example misleading or irrelevant. *Id.* at 28–30. Likewise, post-ratification history should not be given "more weight than it can rightly bear." *Id.* at 35. While evidence of interpretation "immediately after [the Second Amendment's] ratification

3

through the end of the 19th Century represent[s] a critical tool of constitutional interpretation," that evidence becomes less probative as it becomes more recent. *Id.* More recent regulations, from the late 19th or 20th centuries, provide little insight into the original meaning of the Constitution. *Id.* at 36–37. Regulations from this time period do not illuminate the extent of the Second Amendment right at ratification and should be credited only to confirm a prior practice from the more relevant period. *Id.* at 36.

*Bruen's* historical analysis changes based on the societal problem the challenged regulation addresses. When the challenged regulation addresses a "general societal problem that has persisted since the 18th century" the absence of a distinctly similar historical regulation "is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 26. Likewise, if earlier generations addressed the problem "through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* at 26–27. If proposed regulations like the challenged modern regulation "were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality." *Id.* at 27.

4

When the challenged regulation addresses a societal problem that involves "unprecedented societal concerns or dramatic technological changes," courts can employ analogical reasoning. *Id.* at 27 (directing courts to use "analogical reasoning" when confronting "present-day firearm regulations" that "were unimaginable at the founding"). These historical analogues must be "relevantly similar," but "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 29.

The Court addressed how lower courts could determine if regulations were relevantly similar: by assessing "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. In other words, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense [i.e., the 'how'] and whether that burden is comparably justified [i.e., the 'why'] are *central* considerations when engaging in an analogical inquiry." *Id.* (quotations omitted). The Court stressed the limits of analogical reasoning, noting "courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks

5

endorsing outliers that our ancestors would never have accepted." *Id.* at 30 (quotation omitted).

Whether the government's burden requires a "distinctly similar" precursor or "relevantly similar" historical analogue, the "comparable tradition of regulation" must be clear and robust; a historical tradition cannot rest on historical outliers. *Id.* at 64, 69. Rather, the government must demonstrate historical regulations that were both commonly accepted and actually enforced. *See id.* at 4 (expressing "doubt" that statutes from only three of the original thirteen colonies would be sufficient to establish a relevant tradition).

Finally, *Bruen* places the burden on the government to affirmatively prove the historical tradition justifying a challenged firearm regulation. *See id.* at 19, 24. Courts "are not obliged to sift the historical materials for evidence to sustain [a] statute," and challengers do not bear the burden of delineating the extent of the Second Amendment right. *Id.* at 24–25, 60.

Applying the foregoing analyses to the facts of this case, § 922(o) is also unconstitutional as applied to Hudgins. At the time of this offense, Hudgins was an 18-year-old lifelong resident of Detroit, Michigan. He

6

has no adult felony convictions. Detroit is a city notorious for shootings, including shootings causing deaths. Hudgins did not use the gun the police found to cause harm to others. The Second Amendment presumptively protects his conduct in possessing a semiautomatic handgun with a Glock switch—a conversion device that has become common on Detroit streets. Because the government will be unable to show that 922(o) as applied to Hudgins is "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 17, the Court must dismiss the single charge against him.

II. **The common use of Glock switches for self-defense additionally underscores why § 922(o) is unconstitutional as applied here.**

*Heller* confirmed that the right the Second Amendment protects is an individual right includes "us[ing] arms in defense of hearth and home." *Heller*, 554 U.S. at 635. The words "arms" in the Second Amendment includes both "armour of defence" and "weapons of offence." *Heller*, 554 U.S. at 581. Since the founding, "arms" has included "all firearms" that a person can "bear." *Id.* ("The 18th-century meaning is no different from the meaning today."). Further, the Second Amendment presumptively protects "all instruments that constitute bearable arms,

7

even those that were not in existence at the time of the founding." *Id*. at 582; *see also Caetano v. Massachusetts*, 577 U.S. 411, 412 (2016) (holding stun guns to be protected arms). While the "Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense"—including semiautomatic handguns equipped with Glock switches. *Bruen*, 597 U.S. at 28. Thus, the plain language of the Second Amendment covers semiautomatic handguns equipped with Glock switches under the first step of *Bruen*, meaning that 922(o) is presumptively unconstitutional.

Turning to the second step of the *Bruen* test, whether banning switch-enabled handgun possession is consistent with our country's historical traditions in regulating guns, *Bruen* makes clear that the focus of the analysis on the type of "arms" at issue lies whether they are commonly possessed for self-defense:

> we explained that there the Second Amendment protects only the carrying of weapons that are those "in common use at the time," as opposed to those that "are highly unusual in society at large." Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are indisputably in "common use" for self-defense today. They are, in fact, "the quintessential self-defense weapon." Thus, even if these colonial laws prohibited

8

>the carrying of handguns because they were considered "dangerous and unusual weapons" in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.

*Bruen,* 597 U.S. at 48 (quoting *Heller*, 554 U.S. at 627, 629). Clearly such weapons cannot be used to terrorize people, but banning the possession of commonly used "arms" does not comply with the dictates of the Second Amendment. *Id.* (recognizing that laws limiting self-defense laws in effect at the time of the Second Amendment's passage "merely codified the existing common-law offense of bearing arms to terrorize the people.") The carrying of weapons to have at the ready for self-defense is at the crux of the historical right to bear arms.

>The historical evidence from antebellum America does demonstrate that the manner of public carry was subject to reasonable regulation. Under the common law, individuals could not carry deadly weapons in a manner likely to terrorize others. Similarly, although surety statutes did not directly restrict public carry, they did provide financial incentives for responsible arms carrying. Finally, States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly.

*Id.* at 59.

Machineguns themselves (even apart from switch-enabled guns) are in common use for the purposes of self-defense. As of May 2021, there

9

were more than 740,000 machineguns lawfully possessed and registered in the United States.[1] This is almost quadruple the number of lawfully possessed stun guns that Justice Alito found sufficient to characterize that weapon as "widely owned and accepted as a legitimate means of self-defense." *Caetano v. Massachusetts,* 577 U.S. 411, 420, (2016); *see also Maloney v. Singas*, 351 F. Supp. 3d 222, 237–38 (E.D.N.Y. 2018) (finding evidence that 64,890 nunchaku sold on the retail market in the United States between 1995 and 2018 were sufficient to show the weapons was "in common use").

These figures also only include lawfully owned firearms that were grandfathered in from before the passage of the statute in 1986. *See* 18 U.S.C. 922(o)(2)(B); Pub. L. No. 99-308, sec. 102 (May 19, 1986). The actual number of machine guns currently owned by Americans is undoubtedly significantly higher. Even unlawfully owned machine guns count for the purposes of assessing whether it is in "common use." *Cf. Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015) (explaining that "it would be absurd to say that the reason why a

---

[1] U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, Firearms Commerce in the United States: Annual Statistical Update 2021, 15-16 (2021), https://perma.cc/3F6T-7AWV.

particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned").

Further, ATF reports that use of Glock switches has grown exponentially in recent years: "the number of devices recovered by law enforcement increased more than 500 percent nationwide between 2017 and 2021." ATF, Press Release, U.S. Attorney Launches New Initiative "Project Switch Off" to Combat Threat, Nov. 29, 2023, https://perma.cc/DY87-8ZT6. Technology has made it simple for these devices to come into "common use," because "advances in low-cost manufacturing tools, such as 3D printers," make it so that obtaining switches is "no longer expensive or logistically challenging." Alain Stephens & Keegan Hamilton, *Tiny 'Glock Switches' Have Quietly Flooded the US With Deadly Machine Guns*, Vice News, Mar. 24, 2022, https://perma.cc/Y5FB-7DZ7. As a result, ATF Director Steven Dettelbach has confirmed that Glock switches are "flooding our communities." Scott Neuman, *New York proposes a ban on guns that are easy to convert to illegal automatic weapons*, NPR, May 18, 2024, https://perma.cc/87J7-H33F.

11

Thus, as set forth above, section 922(o) is unconstitutional facially and as applied. The government cannot point to a historical analogue that provides justification for laws restricting the public carry of this type of weapon that is in common use today.

The government may cite *Hamblen v. United States*, 591 F.3d 471, 474 (6th Cir. 2009), a pre-*Bruen* decision holding that the Second Amendment does not permit machinegun possession. But *Bruen* changed the landscape of the Court's analysis of Second Amendment challenges, particularly when determining what conduct falls under its protection. *Bruen* requires a "different mode of analysis" than its earlier Second Amendment jurisprudence, specifically, a mode of historical analysis. *See* Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1177 (1989) (explaining that, in determining whether a prior opinion was overruled, courts look not only to the holdings of higher courts but also their mode of analysis).

Though perhaps expedient, relying on pre-*Bruen* caselaw to thwart a constitutional challenge is not a permissible form of constitutional avoidance. This Court may not "sidestep *Bruen*." *Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023). Rather, the Court "must undertake the

12

text-and-history inquiry the Court so plainly announced and expounded upon at great length." *Id.*; *see also United States v. Neal*, No. 20-335, 2024 WL 833607, at *12 (N.D. Ill. Feb. 7, 2024) ("[T]his Court remains bound by its oath to uphold the Constitution—as interpreted by the Supreme Court—and thus must adhere to *Bruen*'s directive."). Neither the Sixth Circuit nor the Supreme Court have issued a decision on a post-*Bruen* constitutional challenge to 18 U.S.C. § 922(o).

### III.  *Rahimi* further bolsters Hudgins's arguments.

This term, in *United States v. Rahimi,* No. 22-915, 2024 WL 3074728, at *5 (U.S. June 21, 2024), the Supreme Court applied the *Bruen* framework in the criminal context for the first time, ultimately holding that 18 U.S.C. § 922(g)(8)(C)(i) is constitutional. That subsection temporarily prohibits an individual subject to a domestic violence restraining order from possessing a firearm if the order included a judicial finding that the person currently represents a credible threat to the physical safety of others. Although ultimately upholding that unique § 922(g) subsection, *Rahimi* embraced *Bruen*'s sharp focus on text, history, and tradition, and the Court's application of the *Bruen* framework made clear that § 922(o)—which imposes an indiscriminate

13

ban on any possession of a "machinegun"—is unconstitutional. At least two facets of *Rahimi* help Hudgins's argument here.

First, the Supreme Court unequivocally rejected the government's oft-repeated argument that the Second Amendment protects only "law-abiding, responsible citizens." *See* Gov't Br. 12, *United States v. Rahimi*, No. 22-915 (U.S. Aug. 14, 2023). In doing so, the government cited several references to the phrase "law-abiding, responsible citizens" in *Heller* and *Bruen*, claiming that the Supreme Court's "precedents recognize that Congress may disarm persons who are not law-abiding, responsible citizens." *Id.* at 12. The Supreme Court definitively rejected that argument. *Rahimi,* 2024 WL 3074728, at *11.[2] In doing so, the Court made clear that drawing such broad, amorphous categories was inappropriate under Second Amendment analysis. Indeed, the Court explained, the term "responsible" is a "vague term," and it is "unclear what such a rule would entail." *Id.*

---

[2] *See also id.* at 27 (Thomas, J., dissenting) ("The Government … argues that the Second Amendment allows Congress to disarm anyone who is not 'responsible' and 'law-abiding.' Not a single Member of the Court adopts the Government's theory.").

14

Not only did the Supreme Court reject the government's theory of mass-divestment for broad and ill-defined categories of people it perceives as not "law-abiding, responsible citizens," the Court also rejected the premise that *Heller* supported such a theory. In *Rahimi*, the Court explicitly stated that the government's argument did not "derive from [its] case law." *Rahimi,* 2024 WL 3074728, at *11. It noted that *Heller* and *Bruen* used the term "responsible" to "describe the class of ordinary citizens who undoubtedly enjoy the right," but neither decision purported to establish a limit on Second Amendment protection through that reference. *Id.* Thus, *Rahimi* confirms that the Supreme Court meant what it said when it declared that the Second Amendment right "belongs to all Americans." *Heller*, 554 U.S. at 581 (2008).

Second, *Rahimi* reaffirms *Bruen*'s mandated and strict historical analysis, making clear that a statute must be struck down under the Second Amendment if the government cannot—as is the case here—identify "relevantly similar" historical laws demonstrating that a modern regulation "is consistent with the principles that underpin our regulatory tradition." *Rahimi,* 2024 WL 3074728, at *6. Moreover, the very features

15

that saved § 922(g)(8)(C)(i) from constitutional peril in *Rahimi* are plainly lacking with respect to the much broader § 922(o).

*Rahimi* also reemphasized *Bruen*'s focus on historical analysis, explaining that courts "must ascertain whether the new law is relevantly similar to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances." 2024 WL 3074728, at *6. "Why and how the regulation burdens the right are central to this inquiry." *Id*. Thus, *Rahimi* made clear that Second Amendment challenges mandate detailed historical analysis applied to a specific law, not sweeping generalities, as the government has attempted to do in defense of § 922(o), for which it has been unable to identify any similar firearm regulations.

With respect to § 922(g)(8)(C)(i), examined in *Rahimi*, the Court ultimately concluded that surety laws and "going armed" laws sufficiently established a tradition of temporarily disarming someone found by a court to pose a credible threat to the physical safety of others (as does § 922(g)(8)(C)(i) does today). Notably, surety laws—like § 922(g)(8)(C)(i)—mitigated "demonstrated threats of physical violence" and were temporary. *Rahimi,* 2024 WL 3074728, at *9. In stark contrast,

16

§ 922(o) contains no requirement that a judge find that someone poses a threat, and the statute bans all possession of machineguns, permanently not temporarily.

Additionally, like domestic violence restraining orders today, the surety regime was "individualized," *Rahimi,* 2024 WL 3074728, at *10, while § 922(o) is categorical. So-called "going armed" laws—again, like § 922(g)(8)(C)(i)—were similarly limited in scope, disarming people based on individualized determinations that they threatened public safety rather than overly broad categorical bans. *Rahimi,* 2024 WL 3074728, at *8. Moreover, a person subject to a surety bond received "significant procedural protections" and "could obtain an exception if he needed his arms for self-defense." *Id*. "Many postfounding going armed laws" incorporated similar exceptions. See *Id*. at 23 (Thomas, J., dissenting). Not so for § 922(o).

Thus, in *Rahimi*, the government successfully came forward with highly specific founding-era regulations that justified the narrowly tailored and temporary firearm restriction found in § 922(g)(8)(C)(i). By contrast, the government still has not identified a single historical firearm law that imposed anything close to § 922(o)'s broad Second

17

Amendment divestmen. Thus, *Rahimi* makes clear that § 922(o) is facially unconstitutional because the government cannot identify a relevantly similar historical analogue, as it was able to do in *Rahimi*.

## CONCLUSION

The Court should dismiss the Indictment because the prosecution violates Hudgins's Second Amendment right to keep and bear arms.

                                              Respectfully submitted,

                                              s/Benton C. Martin
                                              FEDERAL COMMUNITY DEFENDER
                                              Attorney for Axzavier Hudgins
                                              613 Abbott Street, Suite 500
                                              Detroit, Michigan 48226
                                              Phone:  (313) 967-5832
                                              E-mail:  Benton_Martin@fd.org

Dated:  July 9, 2024

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,        Case No. 24-20196

v.

                             Hon. Laurie J. Michelson

AXZAVIER HUDGINS,

        Defendant.
_____/

## **CERTIFICATE OF SERVICE**

I certify that I filed this document, on July 9, 2024, using the CM/ECF system, which will notify opposing counsel of record.

                                              s/Benton C. Martin
                                              FEDERAL COMMUNITY DEFENDER
                                              Attorney for Axzavier Hudgins
                                              613 Abbott Street, Suite 500
                                              Detroit, Michigan 48226
                                              Phone: (313) 967-5832
                                              E-mail: Benton_Martin@fd.org